UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:06CV-P277-H

**BOBBY LEE STOUT**                                                            **PLAINTIFF**

**v.**

**JOHN REES, ET AL.**                                                          **DEFENDANT**

### MEMORANDUM OPINION

This matter is before the Court for initial screening of the complaint pursuant to 28 U.S.C. § 1915A and *McGore v. Wrigglesworth,* 114 F.3d 601 (6th Cir. 1997). For the reasons that follow, the Court will dismiss a portion of the complaint and allow the remaining claims to continue.

### I. SUMMARY OF CLAIMS

Plaintiff, Bobby Stout, is an inmate currently serving a 10-year sentence imposed by the Knox County Circuit Court in 1999. On or about June 6, 2006, he commenced this action by filing a complaint naming seven different Kentucky state prison officials/employees as defendants: John Rees[1], the Commissioner of the Kentucky Department of Corrections; Larry Chandler, the warden at the Kentucky State Reformatory ("KSR"); Paige McGuire, deputy warden at KSR; Bill Searcy, assistant unit director at KSR; Roy Washington, a nurse practitioner at KSR; Lisa White, unit D nurse at KSR; and Charles Williams, "head over transfers" at KSR. Plaintiff has sued each Defendant in both his/her official and individual capacities. Plaintiff is

---

[1] Plaintiff inadvertently misspelled "Rees" as "Reese" in his complaint, summons, and related documents.

seeking injunctive and monetary relief as a result of what Plaintiff describes as numerous violations of his First, Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution as well as for violations of the Americans With Disabilities Act ("ADA") and the Rehabilitation Act of 1973.

Plaintiff filed a lengthy complaint, a memorandum of law in support thereof and numerous other supporting documents, including grievances going back to 2004. The Court has extensively reviewed these documents in an attempt to piece together the facts that comprise Plaintiff's claims.

From the documents, it appears that Plaintiff has experienced on-going psychiatric problems throughout the duration of his state incarceration. He relays that he "cut himself 19 times in the past and was in need of psychological help." In September 2000, Plaintiff was sent to KSR. At some point thereafter, prison officials placed Plaintiff in KSR's Correctional Psychiatric Treatment Unit ("CPTU").[2] Plaintiff reports that he received daily group therapy at CPTU and was "doing very well [there], getting great work reports on [his] progress reports on positive and negative card."

It then appears that sometime in mid-to-late March 2006, Plaintiff was removed from CPTU and placed in segregation unit D, otherwise known as the "hole." Plaintiff alleges that

---

[2]The Kentucky Department of Corrections website explains that CPTU was constructed in response to the ever-increasing number of mentally ill inmates within the Kentucky Department of Corrections. CPTU has one hundred fifty rooms, divided into three wings. It appears that Plaintiff was being housed in the one of the two treatment wings, where inmates receive daily group therapy. *See* http://www.corrections.ky.gov/instfac/adultinst/DMH.htm.

this occurred because a nurse, Linda Deweese, who had romantically pursued Plaintiff for some time,[3] falsely accused Plaintiff of calling her a "bitch."[4] Plaintiff claims that once he was placed in segregation, his group therapy stopped, he was deprived of his medical mattress and handicapped bars, and was not provided with all of his pain medications. This caused a tremendous amount of pressure to build up inside Plaintiff. The pressure was so bad that after a week in segregation "plaintiff left a suicide letter to his family [and then] cut himself upward on one arm, across his neck on the other and covered up with bleeding to death in mind." Plaintiff also appears to have swallowed the razor blade after cutting himself. Prison guards found Plaintiff and took him to an outside hospital where he remained overnight.

After being discharged from the hospital, Plaintiff was returned to segregation "where he was placed in a max cell for 33 to 34 days without a mattress, blanket, sheet, forced to lay, sleep on a hard steel frame bed" as punishment for cutting himself. Plaintiff alleges that this amounts to cruel and unusual punishment because Defendants were aware that Plaintiff had metal screws and rods in his back as a result of a prior surgery and that Plaintiff had a long standing prescription for a medical mattress and handicapped bars.

In order to carry out this "punishment," Plaintiff claims that Defendants Lisa White and Bill Searcy convinced Defendant Roy Washington to write an order overriding Plaintiff's

---

[3]Plaintiff states that he has jewelry that Nurse Deweese gave him and could "pass a lie detector test."

[4]According to Plaintiff when he went to "court call it was broke down to a 1-12 warning, which shows the nurse lied."

prescription for the mattress and bars by stating that Plaintiff did not need them while in segregation.  From the documentation submitted by Plaintiff, it does appear that he did have orders dated November 2005 for the mattress and bars and that for whatever reason they were either changed or not followed while Plaintiff was in segregation.  Plaintiff states that the pain from sleeping on "a steel metal frame bunk without a mattress . . . for 24 hours a day . . . with metal rods screwed into [his] back" was torturous.  Plaintiff also alleges that he was denied prescribed pain medication for his back during his time in segregation.  The pain and pressure on Plaintiff were so great that he again cut himself and was returned to an outside hospital only to be released "and further punished" by Defendants by having to remain in segregation without his medical mattress, handicapped bars, or pain medication for several more days.

  Plaintiff was released from segregation around May 9, 2006.  While it appears that Plaintiff remained at KSR, he was not returned to the CPTU unit because Nurse Deweese had "put a conflict on" him.  It is unclear exactly where Plaintiff was placed within KSR and what treatment, if any, he is currently receiving for his psychiatric and back problems.  From his allegations, however, it appears as if wherever Plaintiff is being housed lacks handicapped bars.

  On May 18, 2006, Plaintiff wrote a letter to Warden Chandler stating that "I need to be put back in CPTU to get treatment for alot of problems I have.  I have alot of mental issues.  I need groups every day and I left a suicide note to my family. . . . I am very depressed medicine is not helping . . . if there is a problem on [Nurse Deweese's] part please move her to another part of the prison so I can get my treatment before I end up dead.  Please help me."  From the

documents submitted by Plaintiff, it does not appear that Warden Chandler responded to Plaintiff's request to be transferred back to CPTU.

Around this same time, it appears that Plaintiff also requested Warden Chandler to grant him protective custody as related to a death threat that he received from another inmate. Plaintiff attached a copy of a letter dated March 6, 2006, addressed to "Bobby rat" that states that there is a "twenty five hundred contract on you" and that Plaintiff would be "a dead rat soon." Plaintiff also attached a newspaper article, which indicates that while testifying for the prosecution in a murder trial: "Stout admitted that he had worked undercover for police and helped convict at least 30 people on drug charges in another location." Presumably, Plaintiff's purpose in attaching this newspaper article is to demonstrate to the Court (and possibly prison officials) that the threats against his life are serious.

From the documents submitted by Plaintiff, it appears that Warden Chandler denied Plaintiff's request for protective custody because Plaintiff would not provide him with the name of the individual Plaintiff believed made the threat against his life. It also appears that at some point around this same time, Plaintiff requested to be transferred to an out-of-state facility. This request was also denied. However, it appears as if Plaintiff may have been approved for a transfer to another facility within the state and is currently awaiting such a transfer.

However, Plaintiff no longer wants to be transferred out of KSR to another facility. Rather, due to his mental state, Plaintiff now wants to be placed immediately back in CPTU, the only place where Plaintiff claims that he can receive both the protection and psychiatric care he

5

needs. In a May 26, 2006, letter to Defendant Williams, Plaintiff explained: "I did not request an expedited transfer, what I said is I have 23 some odd conflicts on my record and why move me from where I am safe and have no conflicts to another place where I may be seriously hurt or killed."

Plaintiff has filed several grievances and written several letters related to the denial of his request for protective custody, his request to be returned to the CPTU unit, and about the treatment he received while in segregation (denial of pain medication, medical mattress, and handicapped bars).

Plaintiff is requesting the Court to order Defendants to provide him with pain medication (presumably for his back) and "to transfer Plaintiff back to the medical facility at the Kentucky State Reformatory where there is handicapped housing, where Plaintiff is close to his back specialist in Louisville, where Plaintiff can go into the CPTU program of the prison to get immediate treatment for psychological problems, [and] where Plaintiff can receive proper pain medication." Plaintiff is also seeking monetary damages to compensate him for the pain and suffering he experienced while he was held in segregation as a result of Defendants removing his medical mattress and their failure to provide him with handicapped bars and previously prescribed pain medication for his back.

## II. INITIAL REVIEW

Under 28 U.S.C. § 1915A, this court must review the instant action. 28 U.S.C. § 1915A ("The court shall review, . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."); *McGore*, 114 F.3d at 604-05. Upon review, this Court must dismiss "the complaint, or any portion of the complaint, if

the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." § 1915A(b). A complaint may be dismissed as frivolous under § 1915A if it is premised on a nonexistent legal interest or delusional factual scenario. *Neitzke v. Williams*, 490 U.S. 319, 329-30 (1989). A complaint, or portion thereof, should be dismissed for failure to state a claim upon which relief may be granted "only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). In reviewing a complaint under this standard, the court must accept all factual allegations contained in the complaint as true and must also construe the pleading in the light most favorable to the plaintiff. *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 561 (6th Cir. 1998).

**A.     Official capacity claims for damages**

The official capacity claims for damages will be dismissed on two bases. First, Defendants, as state officials and employees sued in their official capacities for damages, are absolutely immune from liability under the Eleventh Amendment to the United States Constitution. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity."). Second, Defendants are not "persons" subject to suit within the meaning of § 1983 when sued in their official capacities for monetary damages. *Id.* (concluding that a state, its agencies, and its officials sued in their official capacities for monetary damages are not considered persons for the purpose of a § 1983 claim); *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir. 1994) (same). Consequently, Plaintiff's official

7

capacity claims for damages against all Defendants must be dismissed.

**B.      2004 & 2005 incidents**

Plaintiff attached a number of grievances to his complaint from 2004 and 2005: (1) grievance number 04-239, dated June 12, 2004, regarding the prison's failure to provide Plaintiff with a CT scan of his back; (2) grievance number 04-239, dated June 1, 2004, regarding his movement from one wing to another; (3) grievance number 05-271, dated April 4, 2005, regarding the prison's failure to allow Plaintiff to see a doctor for popping and protruding metal rods in his back; (4) unnumbered grievance, dated April 22, 2005, regarding Sgt. Tingle harassing Plaintiff by taking his breakfast drink and mattress; (5) grievance number 05-273, dated April 8, 2005, regarding Nurse Knowlen's refusal to dispense Plaintiff two Tylenol tablets; and (6) grievance number 04-317, dated September 24, 2004, regarding the prison's decision to delay Plaintiff's back surgery and CT scan (this is actually an appeal to an earlier grievance).[5]

The Court is unclear whether Plaintiff attached these grievances simply for background information related to his back problems or whether Plaintiff is attempting to include these incidents as part of his complaint against Defendants. To the extent that Plaintiff is attempting to assert any claims arising out of these 2004 & 2005 grievances, the Court must dismiss these claims with prejudice because they are time barred.

An action pursuant to § 1983 is subject to the forum state's statute of limitations for personal injury actions. *See Owens v. Okure*, 488 U.S. 235, 251 (1989). For § 1983 actions

---

[5]Plaintiff also filed grievance number 05-036, dated January 10, 2005, regarding the prison's failure to treat another prisoner's Hepatitis C. The Court presumes that this grievance was inadvertently attached to the complaint since it appear to have nothing to do with Plaintiff.

8

originating in Kentucky, the Sixth Circuit has held that the applicable statute of limitations is one year. *Collard v. Ky. Board of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990) ("Accordingly, we conclude that section 1983 actions in Kentucky are limited by the one-year statute of limitations found in section 413.140(1)(a)."). The statute of limitations "begins to run when the plaintiff knows or has reason to know of the injury which is the basis of his action and that a plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Id*. at 183. And, district courts must dismiss the time-barred claims as frivolous where appropriate. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508 (6th Cir. 2001). Here, Plaintiff clearly knew the facts related to the 2004 & 2005 grievances when he filed them. While the statute is tolled during the pendency of the grievance procedure, Plaintiff has not provided any evidence that appeals were still pending on any of these grievances that would have tolled the running of the statute of limitations beyond the disposition dates listed on the grievances. As such, those claims are time barred by the one-year statute of limitations.

**C.**     **Fifth Amendment claims**

The Fifth Amendment of the United States Constitution, which is part of the Bill of Rights, provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const., Amend. V.

Plaintiff fails to explain how specifically he claims that the Fifth Amendment specifically applies to his claims. Based on the facts as alleged by Plaintiff, the Court does not believe that Plaintiff has a cognizable Fifth Amendment claim against Defendants in this instance. Specifically, the Court notes that to the extent that Plaintiff is attempting to rely on the due process clause of the Fifth Amendment, it circumscribes only the actions of the federal government. *See, e.g.*, *Sturgell v. Creasy*, 640 F.2d 843, 850 (6th Cir. 1981); *Walker v. Hughes*, 558 F.2d 1247, 1257 (6th Cir. 1977). Here, the actions of state, not federal, officials are at issue.

### D. Remaining claims

Despite dismissal of the foregoing claims, the Court will allow Plaintiff's First, Eighth, and Fourteenth Amendment claims to proceed against the named Defendants (John Rees, Larry Chandler, Paige McGuire, Bill Searcy, Roy Washington, Lisa White, and Charles Williams) in their individual and official capacities as related to his allegations regarding his treatment while in segregation from March - May of 2006 (failure to provide handicap bars, medical mattress, and pain medication), his removal from the CPTU unit, the denial of his request for protective custody, and Defendants' failure to properly treat Plaintiff's mental and physical health problems. The Court will also allow Plaintiff's claims under the ADA and the Rehabilitation Act of 1973 to proceed at this time.

The Court will enter a separate Scheduling Order governing the development of the remaining claims and will enter a separate Order dismissing all other claims. In permitting the various claims listed above to proceed against the specified Defendants, the Court passes no

judgment on the merit and ultimate outcome of the action.

The Court will enter Orders consistent with this Memorandum Opinion.

Date:

cc: Plaintiff, *pro se*
 Defendants
 General Counsel, Justice & Safety Cabinet, Office of Legal Services, Corrections Division, Bush Building, 2nd Floor, 403 Wapping Street, Frankfort, KY 40601
 Dr. Scott Haas, Medical Director, Kentucky Department of Corrections, Health Services Building, 275 East Main Street, Frankfort, KY 40602
 Kevin Pangburn, Mental Health Director, Kentucky Department of Corrections, Health Services Building, 275 East Main Street, Frankfort, KY 40602

4412.008