UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:06CV-P277-H

**BOBBY LEE STOUT**                                                                                   **PLAINTIFF**

**v.**

**JOHN REES** *et al.*                                                                                 **DEFENDANTS**

**MEMORANDUM OPINION**

This matter is before the Court on Plaintiff's motions for temporary restraining order (DN 6), to supplement (DNs 8, 14, & 32), to stay (DN 20), for placement in the CPTU program (DN 23), to show cause (DN 33), and to appoint counsel (DN 34); and Defendants' motions to supplement (DN 26) and to dismiss (DNs 30 & 37). The Court will address the motions in the most logical and efficient manner possible.

**I. FACTS**

Plaintiff, Bobby Stout, is an inmate at Kentucky State Reformatory ("KSR") currently serving a 10-year sentence imposed by the Knox County Circuit Court in 1999. On or about June 6, 2006, he commenced this action by filing a complaint naming seven different Kentucky state prison officials/employees as defendants: John Rees, the Commissioner of the Kentucky Department of Corrections; Larry Chandler, the warden at KSR; Paige McGuire, deputy warden at KSR; Bill Searcy, assistant unit director at KSR; Roy Washington, a nurse practitioner at KSR; Lisa White, unit D nurse at KSR; and Charles Williams, "head over transfers" at KSR. Plaintiff has sued each Defendant in both his/her official and individual capacities. Along with his complaint, Plaintiff also filed a motion for a temporary injunction asking the Court to order Defendants to transfer him from his current assignment in the general population and back to the

Correctional Psychiatric Treatment Unit ("CPTU"), where he was previously housed.

From the documents submitted by the parties, it is evident that Plaintiff has suffered on-going psychiatric problems throughout the duration of his incarceration.[1] According to Plaintiff, in September 2000, he was sent to KSR, and at some point thereafter, prison officials placed Plaintiff in the CPTU.

The CPTU houses persons who have been adjudicated and convicted of a crime or crimes and have been diagnosed with a mental illness. The CPTU was constructed in response to the ever-increasing number of mentally ill inmates within the Kentucky Department of Corrections. The stated goal of the CPTU program is to assist inmates with achieving a level of stability, which will permit them to live in a less restrictive environment in the prison. The unit has 150 single-occupancy cells. Fifty beds are designated primarily for evaluation and classification purposes. One hundred beds are designated for the treatment program. Mental health professionals including psychologists, psychiatrists, and counselors staff the CPTU. There is also a full staff of caseworkers and recreation leaders, and 24-hour nursing care.[2]

Plaintiff reports that he received daily group therapy at CPTU and was "doing very well [there], getting great work reports on [his] progress reports on positive and negative card." Sometime in mid-to-late March 2006, Plaintiff was removed from the CPTU and placed in segregation due to a conflict with a nurse on the unit. Plaintiff was released from segregation in

---

[1] Plaintiff alleges that he "cut himself 19 times in the past." Although the precise number of suicide attempts is not documented in Plaintiff's medical records, it does appear as if Plaintiff has previously made multiple attempts on his life.

[2] The Court gleaned these facts from a review of a page of the Kentucky Department of Corrections' website that is devoted to the CPTU program. *See* http://apps.corrections.ky.gov.

May of 2006, but he was not returned to the CPTU. Plaintiff then filed this action in June of 2006, complaining about the treatment he received while in segregation and seeking the Court to order Defendants to return him to the CPTU.

On initial review of the complaint, the Court allowed several of Plaintiff's claims to proceed for further development and ordered Defendants to respond to Plaintiff's motion for temporary injunctive relief. In response, Defendants filed a short brief in which they appeared to concede that inmates diagnosed with "serious psychological problems," which Defendants labeled as "AXIS I" conditions, need to be placed in the CPTU in order to obtain proper psychological care: "There are two types of patients . . . the first is AXIS I. This is a patient with a serious mental illness that qualifies for full time treatment at CPTU . . . if [Plaintiff] did have a serious mental illness (AXIS I) it would be evident and he would be in CPTU." Defendants attached a portion of Plaintiff's medical records to their response. The records purported to be psychological evaluations performed on Plaintiff in February 2006 and July 2006, which Defendants claimed supported their arguments that Plaintiff is suffering only from an AXIS II condition, and therefore, should not be in the CPTU. However, the evaluations actually listed the following entry beside AXIS I: "PTSD/PSD" and "PTSD-due to death of twins." Thus, from the face of the records, it appeared that Plaintiff had been diagnosed with an AXIS I condition. Because the exhibits appeared to be inconsistent with counsel's statements that Plaintiff had never been diagnosed with an AXIS I condition, the Court ordered counsel to explain the inconsistencies, and the Court also ordered Defendants to provide the Court with an affidavit from a psychiatrist explaining (1) the nature of Plaintiff's mental illness as diagnosed by Dr. Moore on February 20, 2006, and July 17, 2006, (2) the appropriate treatment for that

illness(es), and (3) specifically what treatment (medications and/or counseling), if any, Plaintiff is currently receiving.

In response to the Court's order, Defendants filed a joint affidavit from three of Plaintiff's treating psychiatrists, Dr. Tanya Young, Dr. Phillip Johnson, and Dr. Laura Moore. According to Plaintiff's physicians, "Plaintiff does suffer from a significant psychiatric discord on AXIS I . . . and may be treated for his mental illness utilizing a combination of psychiatric medication and verbal counseling/therapy." The doctors further advise that "these two mediums of treatment may be delivered to the patient on [an] outpatient basis (i.e. while living with the general population at KSR) or while residing in the B Wing treatment program of CPTU."

Plaintiff is currently living in the general population at KSR and according to his physicians is receiving both medication and counseling to treat his mental illnesses, facts which Plaintiff does not dispute. Plaintiff's doctors do not object to Plaintiff's return to the CPTU, although they remain skeptical of Plaintiff's sincerity and willingness to follow the rules of the CPTU.

## II. ANALYSIS

**A.     Plaintiff's Motions for Temporary Restraining Order (DN 6) and for Placement in the CPTU (DN 23)**

To determine whether to grant a temporary restraining order or a preliminary injunction, a district court must consider: (1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether its issuance would cause substantial harm to others; and (4) whether the public interest would be served by its issuance. *Summit County Democratic Central and Executive Comm. v. Blackwell*, 388 F.3d 547, 550 (6th Cir. 2004); *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue*

*Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). These factors are not "rigid and unbending requirements," as there is no "fixed legal standard" in determining whether to issue an injunction. *In re: Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). While courts have recognized the likelihood of success on the merits as one of the most significant factors in determining appropriateness of injunctive relief, a district court should ordinarily analyze all of the factors before deciding whether to grant or deny the requested relief. *Abney v. Amgen, Inc.*, 443 F.3d 540, 547 (6th Cir. 2006).

      1.      **Likelihood of success on the merits**

Plaintiff argues that he should be immediately placed back into the CPTU program because this is where he believes he will receive the best treatment for his mental illnesses. Prisoners do not have a constitutional right to participate in particular treatment or rehabilitative programs. *See Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (explaining that prisoner classification and eligibility for rehabilitation programs are not subject to constitutional protections); *Griffin v. Kallen*, 791 F.2d 933 (6th Cir. 1986) ("[P]risoner has no constitutional entitlement to a particular classification or to any particular eligibility for rehabilitative programs."). Thus, Plaintiff has no absolute due process right to be placed in the treatment facility of his choice. Rather, under the Eighth Amendment, Plaintiff simply has a right to receive adequate and appropriate treatment for his serious medical needs. Moreover, a difference in opinion between a prisoner and the medical staff about treatment does not state a cause of action. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

In this case, the record is undisputed that Plaintiff suffers from various, rather serious forms of mental illness that require treatment. Three different psychiatrists have provided a

sworn statement indicating that Plaintiff's conditions require treatment with both medication and therapy. Plaintiff's doctors also state, however, that this treatment can be provided either in the CPTU or on an outpatient basis with Plaintiff living in the general population at KSR. Defendants maintain that Plaintiff is currently receiving treatment with medication and weekly therapy sessions while living in the general population at KSR, facts Plaintiff has not disputed.

Thus, it appears as if Defendants are currently meeting Plaintiff's mental health needs. Although Plaintiff might desire those needs to be met in the CPTU instead of on an outpatient basis, the Constitution does not require that Plaintiff's treatment be delivered according to his personal preferences. The Constitution requires only that Defendants meet Plaintiff's serious medical needs. So long as Defendants continue to treat Plaintiff's mental illnesses through a combination of medication and therapy sessions as ordered by his doctors, they are free to house him in either the general population or the CPTU as they see fit. Thus, it does not appear likely that Plaintiff's claim for return to the CPTU is likely to succeed on the merits.

### 2. Harm to plaintiff

The second factor under the preliminary injunction test is whether Plaintiff will suffer immediate and irreparable harm absent injunctive relief. To demonstrate irreparable harm, Plaintiff must show that he will suffer "actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney*, 443 F.3d at 552. Plaintiff maintains that unless he is placed back into the CPTU, he may ultimately end up taking his own life.

As an individual with serious mental illnesses, Plaintiff suffers from an increased risk of harming himself no matter where he is housed. Plaintiff is receiving medication and therapy on an outpatient basis in an effort to treat his mental illnesses and hopefully prevent Plaintiff from

6

harming himself. It appears that Plaintiff can receive this treatment outside of the CPTU.

Moreover, throughout the course of these proceedings, the Court has attempted to place the proper mental health care professionals on notice of Plaintiff's suicidal thoughts, and the Court believes based on the various records placed into evidence that Plaintiff has been evaluated and is receiving appropriate treatment for any suicidal thoughts he might be experiencing. It also appears that in the past when Plaintiff threatened suicide he was placed in segregation under constant observation. The Court has no reason to believe that this will not continue to occur, even outside of CPTU. Thus, based on the record, the Court cannot conclude that Plaintiff is exposed to an increased risk of suicide by remaining in the general population.

### 3.     Harm to others

The third factor the Court must consider is whether substantial harm to others will occur if the injunction is granted. According to Defendants, there are a limited amount of beds in the CPTU. Plaintiff's physicians have determined that his conditions can be properly treated outside of the CPTU. Ordering Plaintiff to be placed in the unit now could potentially result in another inmate losing his spot in the unit. Thus, ordering the relief requested by Plaintiff could potentially harm others.

### 4.     Public interest

The final factor is whether the public interest would be served by granting Plaintiff's motion for a preliminary injunction. So long as Plaintiff is receiving treatment, the Court does not find that the public has an interest as to where within the prison system Plaintiff receives that treatment. Indeed, the Court believes that the public interest is best served by allowing prison officials to decide how to best manage the day-to-day operations of their prisons, including the

placement of prisoners. *See United States v. Michigan*, 940 F.2d 143, 157 (6th Cir. 1991). For whatever reason, prison officials have determined that Plaintiff should remain in the general population at KSR. So long as Plaintiff receives adequate mental health care treatment, it is not for the Court to second guess the prison officials' decision as to where that treatment takes place within the prison.

Each of the four factors weighs decidedly against granting Plaintiff's request to be immediately transferred to the CPTU. As such, the Court will deny Plaintiff's motions for temporary restraining order (DN 6) and for placement in the CPTU program (DN 23).

**B.      Plaintiff's Motions to Supplement (DNs 8, 14, & 32)**

Plaintiff has filed three motions seeking to supplement the record with additional documents he claims relate to his complaint. The Court will allow those documents to remain a part of the record. The Court's decision to allow the documents to remain in the record, however, shall not be construed as a determination on the ultimate relevancy or admissibility of the documents in question. Furthermore, it is unclear to the Court whether Plaintiff is attempting to assert additional claims against Defendants by adding these documents to the record. Since Plaintiff has not moved to amend his complaint, any such request would be improper. The Court is simply allowing the documents to remain a part of the record. At this time the Court has not permitted Plaintiff to amend his complaint to add any additional claims against Defendants.

**C.      Plaintiff's Motion to Stay (DN 20)**

On August 21, 2006, Plaintiff filed a motion to stay stating that he was feeling suicidal again and needed to report those thoughts to someone. Plaintiff indicated that once he reported his suicidal thoughts to prison officials he would be placed in segregation and would not be able

to prosecute this action. Accordingly, he requested a 90-day stay. In the weeks following his request, however, Plaintiff continued to file motions and responses with the Court. Based on Plaintiff's conduct, it appears as if he is able to continue to prosecute this action. Accordingly, the Court will deny his request for a stay.

**D.     Plaintiff's Motion for Order to Show Cause (DN 33)**

For the most part, Plaintiff's motion for order to show cause simply restates the allegations set forth in his original complaint and seeks to have the Court hold Defendants in contempt for their alleged actions. Plaintiff's complaint will be adjudicated in due course, and the Court will not entertain motions by Plaintiff to hold Defendants in "contempt" based on the allegations in Plaintiff's complaint. Plaintiff's motion also alleges that Defendants have retaliated against Plaintiff for filing this action. If Plaintiff wishes to assert a retaliation claim against Defendants as part of this action, he must file a motion to amend pursuant to Federal Rule of Civil Procedure 15. Plaintiff is reminded that he must also administratively exhaust such claims. Accordingly, the Court will deny Plaintiff's motion to show cause.

**E.     Plaintiff's Motion to Appoint Counsel (DN 34)**

Prisoners do not possess a constitutional right to the appointment of counsel in a civil case. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993). Rather, appointment of counsel lies exclusively within the Court's discretion. *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent any person unable to afford counsel."). Furthermore, appointment of counsel is justified only in exceptional circumstances. *Lavado,* 992 F.2d at 606. To determine whether exceptional circumstances exist, the Court must consider the complexity of the issues involved and the ability of Plaintiff to represent himself. *Id.* The Court does not

9

find that the complexity of the legal issues in this case necessitates the appointment of counsel. Further, based on the pleadings filed thus far, it appears that Plaintiff is familiar with the workings of the legal system and is able to represent himself. His pleadings are articulate, reflecting Plaintiff's ability to express himself to the Court. Thus, the Court concludes that Plaintiff has not set forth any exceptional circumstances warranting appointment of counsel at this time. As such, the Court will deny this motion.

**F.     Defendants' Motion to Supplement (DN 26)**

Defendants filed a motion to supplement their objection to Plaintiff's motion for injunctive relief with a September 21, 2006, letter from one of Plaintiff's treating physicians. The Court will grant Defendants' request and advises that it considered the letter as part of the original response.

**G.     Defendants' Motions to Dismiss (DNs 30 & 37)**

Defendants filed two documents captioned "motions to dismiss." The first motion seeks dismissal of the complaint. The second "motion," however, is actually a response to one of Plaintiff's motions to supplement, and the relief requested by Defendants is a "dismissal" of Plaintiff's motion.

While the first motion (DN 30) seeks dismissal of the complaint, it is not in conformance with the Local Rules, which specify that "[e]xcept for routine motions--such as motions for extension of time--each motion must be accompanied by a supporting memorandum." L.R. 7.1(a). Defendants' motion to dismiss does not include a single citation to any case law or rules, and it was not accompanied by a memorandum. A dispositive motion is not the sort of routine motion that can be filed without an accompanying memorandum. This Court will not consider

10

dispositive motions filed by counsel that are not properly supported. *See* LR 7.1(b)("Failure to file a supporting memorandum may be grounds for denying [a] motion."). As such, the Court will deny Defendants' motion to dismiss. If Defendants contend that they are entitled to dismissal under Fed. R. Civ. P. 12(b)(6), or alternatively, summary judgment under Fed. R. Civ. P. 56(b), then they should file an appropriate motion <u>that is accompanied by a supporting memorandum</u>.

Since the second "motion to dismiss" is nothing more than a response to one of Plaintiff's many motions, it will also be denied. In the future, counsel is instructed to designate responses to motions only as responses and not as "motions to dismiss."

The Court will enter an order consistent with this memorandum opinion.

Date:

cc:     Plaintiff, *pro se*
        Counsel of Record

4412.008